IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SYED "ALEX" ALI § | | |
| § | | |
| **Plaintiff** § | | |
| § | | |
| vs. § | | CASE NO. 2:05CV206 |
| § | | |
| WOODLAND HEIGHTS MEDICAL CENTER § | | |
| § | | |
| **Defendant** § | | |

## MEMORANDUM OPINION

Plaintiff Syed "Alex" Ali ("Ali") brought suit against Woodland Heights Medical Center ("WHMC") alleging that WHMC discriminated against him based on his national origin in violation of 42 U.S.C. § 2000e ("Title VII") and 42 U.S.C. § 1981 ("§ 1981") and based on his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 ("the ADEA"). The matter came for trial on the merits without a jury and was taken under submission. After considering the testimony, exhibits, arguments of counsel, and supporting memoranda, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).[1]

## BACKGROUND

Ali was born in India on April 27, 1944 and has since become a United States Citizen. Ali received his Masters in Food and Nutrition from North Dakota State University in 1974 and worked in food and nutritional services departments for various hospitals and medical facilities before being

---

[1] To the extent that any conclusion of law is deemed to be a finding of fact, it is adopted as such; and likewise, any finding of fact that is deemed to be a conclusion of law is so adopted.

1

employed by WHMC. In May of 2002, WHMC hired Ali as the Director of Food Services. Ali was the first person hired by WHMC to be the Director of Food Services. One of the reasons WHMC created the Director of Food Services position was to help improve its patients' satisfaction with the food services provided by the hospital. When Ali began work in 2002 he reported to Shawn Barnett, the Chief Financial Officer for WHMC. Ali's only performance review during his tenure at WHMC was completed by Shawn Barnett in May of 2003. In March 2003, WHMC hired Brad Holland ("Holland") to fill the position of Chief Operating Office ("COO") at the hospital. Ali began reporting to Holland shortly after Holland took over as COO.

Both prior to and during Ali's tenure as Director of Food Services, WHMC received quarterly patient survey reports from the Gallup Organization ("Gallup"). These survey reports were based on information gathered from patient surveys conducted at WHMC during the quarter and reflected WHMC patients' perceptions of various aspects of the hospital. The survey reports provided a mean score between one and four for each category in which patients were surveyed at WHMC for that quarter. The reports also indicated how WHMC's score in each particular category compared to other Triad Hospitals, Inc. ("Triad") hospitals and all hospitals, both Triad and non-Triad, surveyed by Gallup in that quarter.[2] The survey reports further indicated if a hospital was significantly below the Triad mean in a certain category of the survey.

One category reflected in the survey reports was the patients' satisfaction with the hospital's food services. WHMC's survey scores for food services were consistently low from the fourth quarter of 2002 through the second quarter of 2004. *See* (Defendant's Exhibits 29-35). During this period WHMC consistently ranked in or near the bottom 10% of all hospitals surveyed and

---

[2] Triad is the parent company of WHMC.

repeatedly scored significantly below the Triad mean in the food services category. In the first quarter of 2003, the Gallup report indicated that WHMC's food services was the lowest of all categories surveyed at the hospital and was in the bottom 9% of all hospitals surveyed by Gallup in that quarter. (Defendant's Exhibit 30). In the second quarter of 2003, the first quarter that Ali reported to Holland, WHMC's food services ranked 13% among all of the hospitals surveyed and continued to be the lowest score of all categories surveyed at WHMC. (Defendant's Exhibit 31). The food services scores for the second quarter of 2003 were the highest scores in that category during the time that Ali reported to Holland. In the third quarter of 2003, scores for WHMC's food services were in the bottom 2% of all the hospitals surveyed by Gallup. (Defendant's Exhibit 32). And in the fourth quarter of 2003, WHMC's food services scores were in the bottom 4% of all hospitals surveyed and were the lowest among all categories surveyed at the hospital. (Defendant's Exhibit 33). During every quarter that Ali reported to Holland, the survey report indicated that the food services scores for WHMC were significantly lower than the food services scores at the other Triad hospitals.

After taking over as Ali's supervisor, Holland and Ali discussed the low food services scores at least on a quarterly basis and often intermittently throughout the quarter. The two considered potential ways to improve the food services scores. Ali recommended to Holland that WHMC purchase a "heat-on-demand" system to better control the temperature of the food as a potential way to improve the food services scores. A "heat-on-demand" system was eventually implemented at WHMC after Ali was terminated.

On February 12, 2004, Holland met with Gary Looper ("Looper"), the CEO of WHMC, to go over Holland's Performance and Development Review for 2003. One of the nine Developmental

Needs and Goals for Holland in the upcoming year set out in the review was to "Increase Patient/Physician satisfaction with food services to Triad mean" by a target date of December 2004. After Holland's meeting with Looper, Holland met with Ali and the two Food Services Department supervisors, Latonya Austin and Celsa McGaughey, to discuss ways to raise the food services scores in accordance with Holland's developmental goal. At this meeting Holland offered bonuses to the supervisors if the goal was met and threatened Ali and the supervisors that if they could not meet the goal he would find someone who could. Holland instructed Ali and the supervisors to create an action plan for how they would increase the food services scores to the Triad mean.

Sometime after April 16, 2004, Holland received the survey report for the first quarter of 2004. WHMC scored in the bottom first percentile of all hospitals in the Gallup database in the area of food services. (Defendant's Exhibit 34). Holland again met with Ali and the two food services supervisors, now Latonya Austin and Melissa Hoffman. Ali presented Holland with the action plan that Ali and Celsa McGaughey prepared after the last meeting with Holland. Holland was not satisfied with the one page list of objectives. Holland inquired whether Ali and the supervisors had taken any steps to implement their action plan. Ali and the supervisors indicated that they started using steaks instead of Salisbury steaks, started making omelets, got a new steam table, and hung new art on the cafeteria wall.

Holland became concerned that Ali did not have a tangible plan for improving the food services scores by the end of the year. Furthermore, Holland was not confident in his own ability to devise a plan based on his lack of experience with food services departments. Holland began looking for an outside consulting service to help develop a plan to improve the Food Services Department and consequently the food services scores. After contacting several companies and

industry consulting firms such as Sodexho, Marriot, Don Miller and Associates, and Ruck-Shockey, Holland determined that he could not afford to hire an outside consulting firm to help him develop a plan.

In April 2004, Holland attended a leadership conference in California were the CEO of San Angelo Community Medical Center ("San Angelo") gave a presentation about his hospital's food services department, which was the highest scoring food services department among all Triad and non-Triad Gallup surveyed hospitals. After the conference, Holland sent an email to all COO's and Chief Nursing Officers at Triad hospitals indicating that WHMC's food services scores were in the bottom first percentile of all hospitals in the survey. Holland inquired whether anyone had a "top notch dietary director" that would be willing to come to WHMC to identify some ways that the hospital could improve its scores. (Defendant's Exhibit 56). Holland received a few responses to his email but no one offered to send assistance.

After Holland had no success with these other avenues, Looper called the CEO of San Angelo to ask if he would agree to send the Food Services Director at San Angelo to WHMC to conduct an audit of the Food Services Department. The CEO of San Angelo agreed to send the San Angelo director. Holland scheduled Henry Wiens ("Wiens"), the Executive Chef and Director of Food Services at San Angelo to visit WHMC. Prior to his visit, Wiens sent Holland several monitoring tools to help gather information about different aspects of the WHMC Food Services Department.

After a three day audit of the Food Services Department during the week of June 3, 2004, Wiens indicated various problem areas within the department and made a summary of his findings entitled "Summary of Henry Wiens Visit to Consult Woodland Heights Nutrition Services 6/2/04."

Wiens's summary included a list of recommendations to help Holland improve the department. (Defendant's Exhibit 19). Additionally, Wiens provided Holland with an "Action Plan" to help implement Wiens's recommendations. (Defendant's Exhibit 20). Wiens's main recommendation was that WHMC's Food Services Department needed a leadership change and suggested that Holland terminate Ali. Other problem areas identified by Wiens included the cleanliness of the kitchen, inappropriate use and cleanliness of the freezer, temperatures of the food, inappropriate quality control measures, lack of menus, lack of food flavoring, lack of standardization, lack of recipes, lack of accountability, lack of tray line audit, and lack of food quality and monitoring. Wiens recommended permanently replacing Ali and identified April Didrikson ("Didrikson"), a local bakery owner and chef, as a possible permanent replacement and Amy McCloud ("McCloud") as a possible interim director.

Ali was terminated from his position as Director of Food Services at WHMC on June 22, 2004. Holland was personally responsible for making and implementing the decision to terminate Ali. Holland claims that he made the decision to terminate Ali based on the consistently low food services scores, Holland's perception that Ali was incapable of improving those scores, and Wiens's recommendation. Holland had not previously terminated anyone at WHMC or at any other time in his career.

Ali did not receive a performance evaluation during the time he reported to Holland. Holland began Ali's 2003 performance review, which was due in May of 2004, on June 1, 2004 but decided to wait to complete it until after Wiens's visit. Holland intended to incorporated some of Wiens's suggestions into Ali's evaluation.

After Ali's termination, WHMC hired McCloud as the interim Director of Food Services.

Wiens met with McCloud during his audit of WHMC and indicated to Holland that she had a strong background in food services and a good potential for leadership. Wiens recommended that McCloud would make a good interim director until Holland could find a new permanent director. McCloud was born in the United States and was in her late thirties at the time she took over as the interim Director. Before becoming interim director, McCloud was one of WHMC's two Registered Dieticians, along with Ranjani Reddy ("Reddy"). Reddy was out of the country during Wiens's visit to WHMC. Accordingly, Wiens never met Reddy. WHMC interviewed Didrikson and several other candidates for the permanent Director of Food Services position after Ali was terminated but was unable to hire a suitable candidate. In December 2004, McCloud was promoted to the permanent Director of Food Services at WHMC.

Ali filed this case against WHMC on June 1, 2005.

## APPLICABLE LAW

Claims pursuant to Title VII, § 1981, and the ADEA are analyzed under the Supreme Court's evidentiary framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[3] *See LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 n.2 (5th Cir. 1996). A plaintiff bringing a cause of action for discrimination under Title VII, § 1981, or the ADEA must first establish a "prima facie" case of discrimination by a preponderance of the evidence. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). If the plaintiff meets its burden, the burden then shifts to the defendant "'to articulate some legitimate nondiscriminatory reason for the employee's rejection.'" *Id*. at 253 (quoting *McDonnell Douglas*, 411 U.S. at 802). If the defendant carries its

---

[3] The Supreme Court applies the *McDonnell Douglas* framework used in Title VII and § 1981 cases to claims brought under the ADEA. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 520 U.S. 13, 142 (2000). Accordingly, the Court will apply the *McDonnell Douglas* framework to all of Ali's claims in this case.

burden, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but a pretext for discrimination." *Id*. (citing *McDonnell Douglas*, 411 U.S. at 804). The plaintiff always maintains the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against him. *Id*.

## ANALYSIS

The parties stipulated that Ali established a prima facie case of discrimination under Title VII, § 1981, and the ADEA. Furthermore, Ali does not dispute that WHMC met its burden by producing admissible evidence of a legitimate non-discriminatory reason for terminating Ali based on poor work performance. Since WHMC met its burden, the burden shifting and presumption framework set out in *McDonnell Douglas* is no longer relevant. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 (1993). At this point, the presumption that Ali was intentionally discriminated against "drops out of the picture." *See id*. at 510-11. Ali must prove that WHMC's reason for firing him was a pretext for discrimination. *See id*. at 511.

To prove that WHMC's reason for terminating Ali was a pretext for discrimination, Ali must prove "*both* that the reason was false, *and* that discrimination was the real reason." *Id.* at 515. Ali's burden to prove that WHMC's reason for terminating him was not the true reason "merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." *Id*. at 516. Ali must persuade the Court that he has been the victim of intentional discrimination "either by directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing the employer's proffered explanation is unworthy of credence. *Id*. at 517. Ali does not present direct evidence that a discriminatory reason motivated WHMC,

8

therefore, he must indirectly prove that WHMC's proffered explanation is not worthy of credence.

Ali presents several different theories as to why WHMC's purported reason for terminating Ali was a pretext for discrimination. Ali's underlying theory appears to be that WHMC and Holland orchestrated the audit by Wiens's in order to create the appearance that Ali was being terminated for poor performance to cover up the real reason for his termination, his national origin and/or his age. Ali presents numerous arguments, some of which are discussed below, for why WHMC's proffered explanation for terminating Ali is not credible. However, Ali does not persuade the Court by a preponderance of the evidence that WHMC's reason for terminating Ali was a pretext for discrimination.

Ali claims that WHMC's reason for firing Ali changed from a reduction in force to poor performance after Ali filed a complaint with the Equal Employment Opportunity Commission. Ali argues that this alleged change in WHMC's reason for terminating Ali is persuasive evidence that WHMC did not truly terminate Ali for poor performance. Ali points to records created by Sally McKinney ("McKinney") to support his argument. After Ali's termination, McKinney, WHMC's Human Resources Director, recorded on Ali's internal termination form that the reason for Ali's termination was a reduction in force. McKinney also reported to the Texas Workforce Commission that Ali was terminated as a reduction in force. McKinney claims that she simply made a mistake when she marked on Ali's termination form that he was terminated for a reduction in force. She claims that she assumed Ali was terminated as a reduction in force because he was given a severance package and because other employees had recently been terminated for that reason. McKinney also admitted that she knowingly misrepresented the reason for Ali's termination on records filed with the Texas Workforce Commission so that Ali would be eligible for unemployment pay. However,

McKinney further testified that she knew she did not have to make this misrepresentation to the Texas Workforce Commission because Ali would still get unemployment pay even if she did not indicate a reason for his termination.  There is no evidence that Holland, the one who made the decision to terminate Ali, had any communication with McKinney with regard to the reason for his termination until a week after Ali was terminated.

Ali implies that either Holland instructed McKinney or that McKinney took it upon herself to incorrectly indicate that Ali was terminated as a reduction in force to cover up for the fact that he was actually terminated based on his age and/or national origin.  Ali argues that the fact that McKinney's records are inconsistent with WHMC's proffered explanation is evidence that the proffered explanation is not credible.  However, Ali's argument related to these records is inconsistent with his own theory that Wiens's report was orchestrated before Ali was terminated to manufacture a pretext of poor performance.  If Ali's theory that WHMC orchestrated Wiens's audit were true, it would not make sense for WHMC to intentionally record that Ali's termination was a reduction in force instead of for poor performance.  If WHMC intentionally created a pretextual reason for terminating Ali surely it would have indicated that same prextetual reason on these forms. Although McKinney's records are inconsistent with WHMC's explanation for terminating Ali, this inconsistency is not strong evidence that WHMC's explanation is pretextual.  Rather, this inconsistency more strongly supports the conclusion that there was poor communication between Holland and the Human Resources Department.

Furthermore, it is undisputed that McKinney had nothing to do with the actual decision to terminate Ali and her understanding of why he was terminated is not particularly probative of Holland's motivations for terminating him under the circumstances.  There is significant evidence

supporting Holland's explanation that he believed he needed to terminate Ali for his poor performance. In light of this evidence, McKinney's inaccurate and inconsistent records do not prove beyond a preponderance of the evidence that Holland's purported reason for terminating Ali for poor performance is not credible.

Additionally, Ali contends that there are no documents to justify WHMC's explanation that Ali was terminated for poor performance.[4] To the contrary, Wiens's report to Holland specifically recommends that many of the problems with the Food Services Department are rooted in the Department's lack of leadership. Weins clearly documented his belief that many of the Food Services Department's problems stemmed from the lack of leadership and recommended replacing Ali. This report was generated before Ali was terminated and supports Holland's claims that he believed Ali was performing poorly at the time he terminated Ali.

Ali argues that evidence of his good performance undermines WHMC's claim that he was terminated for poor performance. Ali points to his 2003 performance review completed by Shawn Barnett as evidence that Holland did not really believe Ali was a poor performer. However, reviews performed by Holland's predecessor have little to no bearing on whether Holland believed Ali was performing poorly at the time he terminated him. Furthermore, Holland testified he did not review and was not aware of Ali's 2003 review at the time he terminated Ali.

Additionally, Ali points to a bonus he received in 2004 for his performance in 2003 as

---

[4] Ali argued multiple times during trial that WHMC did not produce certain documents, implying that the failure to produce these documents should be taken as evidence that WHMC's reason for terminating Ali was in fact a pretext for discrimination. However, Ali never filed a motion with the Court to compel the production of any of these documents and WHMC repeatedly made representations to the Court that the requested documents either never existed or no longer exist. In the absence of a motion to compel or evidence that WHMC withheld documents in bad faith, the Court cannot make a determination as to whether these documents should have or even could have been produced. Accordingly, Ali's allegations that WHMC did not produce certain documents is not considered as evidence that WHMC's reason for terminating Ali is a pretext for discrimination.

evidence that Holland did not believe he was a poor performer. However, this bonus was received by every eligible department director at WHMC in 2003 regardless of their individual performance because of the overall financial performance of WHMC in 2003. Accordingly, this bonus is not a strong indicator of Holland's or anyone else's opinion of Ali's performance in 2003.

Ali also presents a list of other reasons that his performance was viewed as "good" while at WHMC. However, there is no evidence that Holland was ever aware of any of the alleged indicators of "good" performance. Furthermore, "A dispute in the evidence concerning . . . job performance does not provide a sufficient basis for a reasonable factfinder to infer [the] proffered justification is unworthy of credence." *Mayberry v. Vaught Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995)(citing *Little v. Republic Refining Co., LTD.*, 924 F.2d 93, 97 (5th Cir. 1991)). The evidence presented by Ali to suggest he was a "good" performer does not discredit Holland's testimony that he believed Ali was performing poorly.

Ali also argues that the fact that several physicians at WHMC and Holland wrote him recommendation letters after his termination prove that he was viewed as a good performer. The only letter that is of any significance is the one written by Holland. The physicians' letters have no bearing on what Holland, who made the termination decision, thought about Ali's performance or why he actually terminated Ali. Holland testified that he wrote a recommendation letter for Ali hoping it would help Ali find another job. Holland's testimony is consistent with his claims that he felt bad about letting Ali go and that he wanted to help Ali. The fact that Holland wrote a fairly positive recommendation letter for Ali does not prove his explanation is a pretext for discrimination.

Additionally, Ali contends that Holland and WHMC departed from procedural practices when terminating Ali and generally did not treat him fairly. Specifically Ali points to the fact that

he never got the benefit of certain policies with regard to his termination, nor was he given prior notice and a chance to improve his performance before being terminated. Ali contends that these failures to follow certain policies are evidence of a discriminatory motive. However, Holland had not ever terminated anyone before terminating Ali and had not developed any practices in terms of following the policies referenced by Ali. Accordingly, the fact that Holland did not follow these policies does not prove the existence of disparate treatment. Furthermore, Holland was not required by either Triad or WHMC to follow the policies referenced by Ali. At most, Holland's failure to follow the procedures referenced by Ali demonstrates Holland's lack of professionalism and experience.

Ali also presents multiple reasons why Wiens's audit and report were not credible or lacked legitimacy. Furthermore, Ali argues that Wiens was not truly an independent auditor and that his recommendations to Holland were not in a form that one would expect from a true consultant. However, Ali did not present any evidence to persuade the Court that Holland did not believe that Weins or his report were legitimate or reliable. And whether or not Wiens was truly an independent auditor is not particularly relevant under the circumstances. Wiens was the food services director at the hospital with the highest food services scores in the very survey in which Holland wanted to improve WHMC's scores. Under the circumstances, it is very reasonable that Holland would rely on Wiens's opinion and believe that it was both legitimate and credible. "The existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification." *Little*, 924 F.2d at 97. Therefore, Ali's objective criticism of Wiens's audit and report, right or wrong, does not prove that Holland was not truly motivated by

13

Wiens's report.

Ali also urges multiple reasons why the Gallop survey results were not a legitimate indicator of Ali's performance. However, Ali's criticism of the Gallup surveys themselves are irrelevant. Again, what matters is that Holland viewed the survey reports as an indicator of Ali's performance at the time of his termination. It is not unreasonable that Holland would ultimately hold the Director of Food Services responsible for low food services scores in the Gallup survey, particularly after the director of food services from the hospital with the highest scores in the survey indicated that Ali was the main reason for the low scores.

Ali contends that the fact that the "heat-on-demand" system was eventually implemented at WHMC proves that WHMC's reason for terminating him was a pretext for discrimination. There is no dispute that the "heat-on-demand" system was implemented at WHMC in July of 2004, after Ali was terminated. The $100,000 system was ordered after WHMC received a monetary award from Triad for its 2003 performance at the conference Holland attended in California in April of 2004. There is also no dispute that in the quarter after Ali was terminated and the "heat-on-demand" system was implemented the food services scores increased from 2% to 36% in one quarter. *See* (Defendant's Exhibits 35, 36). Ali argues that the "heat-on-demand" system was the reason for the increase in scores. Although it is doubtful that the "heat-on-demand" system was the only cause for the increase in scores, as evidenced by fluctuation in the scores in subsequent quarters, the implementation of the system after Ali's termination does not prove that WHMC's reason for firing Ali was pretextual. The fact that the "heat-on-demand" system might have improved food services scores after Ali was terminated only proves that Holland may have made a bad decision in terminating Ali and does not prove that WHMC's purported reason for terminating him was a

pretext for discrimination.

Ali suggests that Holland's decision to hire McCloud as the interim director instead of Reddy, the other dietician at WHMC, is evidence of discrimination because Reddy, like Ali, was born in India and was older than McCloud. It is undisputed that Reddy was absent from the hospital for more than a month during the time that Wiens performed his audit and Holland made the decision to terminate Ali. Additionally, it was not until after WHMC posted the position and interviewed several candidates that Holland decided to offer the permanent position to McCloud based on her performance as interim director. Furthermore, there is no evidence that Reddy was interested in either the interim or permanent director positions. Ali's argument is not persuasive.

Even in light of Ali's arguments, the overwhelming weight of the evidence supports WHMC's claim that Holland terminated Ali because he believed that Ali was performing poorly. It is clearly documented that the CEO of WHMC assigned Holland the goal of improving the low food services scores in the Gallup survey by December of 2004. It is undisputed that Holland had a meeting with Ali and the supervisors of the Food Services Department to discuss ways to improve the food services scores. The next survey report Holland received from Gallup after this meeting indicated that food services scores decreased even further and were in the bottom first percentile of all hospitals surveyed by Gallop. It is also well documented that Holland immediately began looking for help from outside consultants and other COO's at Triad hospitals around the country in an effort to come up with a plan to improve WHMC's low food services scores. WHMC's CEO eventually helped Holland set up a visit from Wiens, the director of food services at the hospital with the highest food services score among all the Triad and non-Triad hospitals, to come evaluate WHMC's Food Services Department. After his audit, Wiens strongly encouraged Holland to replace

the leadership of the Food Services Department and to terminate Ali. With a little more than six months left to reach his December 2004 goal of raising the food services scores to the Triad mean, Holland decided to terminate Ali and find a new Director of Food Services.

Although, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to concluded that the employer unlawfully discriminated," Ali has not persuaded the Court that WHMC's asserted justification is false in this case. *Reeves v. Sanderson Plumbing Prods., Inc.*, 520 U.S. 13, 148 (2000). Furthermore, even if Ali had proven by a preponderance of the evidence that WHMC's reason for terminating Ali was false, Ali has not presented any significant evidence of age-based or national origin-based animus on the part of Holland. The ultimate question is not whether the Court believes WHMC's reason for terminating Ali, but whether the Court believes Ali's explanation of intentional discrimination. *St. Mary's Honor Ctr.*, 509 U.S. at 515. "When a plaintiff alleges disparate treatment, 'liability depends on whether the protected trait [(age and national origin)] actually motivated the employer's decision.' That is, the plaintiff's age [or national origin] must have 'actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome.'" *Reeves*, 520 U.S. at 141 (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993))(internal citations omitted). Ali has not presented persuasive evidence that WHMC or specifically Holland made the decision to terminate Ali based on his age or national origin.

It is unquestionable that Ali was treated unprofessionally and without much courtesy in the manner in which he was terminated. As a matter of professionalism, Ali should have been informed of Wiens's criticisms and given an opportunity to defend himself against the allegations regarding his leadership abilities. However, the Court is not tasked with deciding whether Holland acted

16

professionally or even whether his decision to terminate Ali was a good one. The only question the Court must answer is whether WHMC's proffered explanation for terminating Ali was a pretext for discrimination.

The evidence presented at trial leads to the conclusion that Holland was very concerned about meeting his year end goal of getting the patient satisfaction scores for food services to the Triad mean. Holland, a fairly young and inexperienced manager apparently made a somewhat knee jerk decision out of fear that he would not meet his year end goal. Although Holland may have made a poor decision and certainly did not implement it in the most professional manner, Ali has not persuaded the Court that his reason for terminating Ali was a pretext for discrimination because "even an incorrect belief that an employee's performance is inadequate constitutes a legitimate non-discriminatory reason." *Little*, 924 F.2d at 97. Ali has not proven by a preponderance of the evidence that Holland's, and thus WHMC's, reason for terminating Ali was a pretext for discrimination. Accordingly, Ali has not met his burden of persuading the Court that he was intentionally discriminated against by WHMC under Title VII, § 1981, or the ADEA.

## CONCLUSION

For the reasons stated above, the Court does not find that WHMC intentionally discriminated against Ali based on his national origin under Title VII, § 1981, or based on his age under the ADEA. Accordingly, the Court finds for WHMC and **HOLDS** that Ali take nothing.

**So ORDERED and SIGNED this 7th day of August, 2006.**

_____
      **LEONARD DAVIS**
      **UNITED STATES DISTRICT JUDGE**